# EXHIBIT A

E-FILED
8/29/2022 4:18 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
22CV403296
Reviewed By: R. Walker

Shaun Setareh (SBN 204514)
  shaun@setarehlaw.com
Jose Maria D. Patino, Jr. (SBN 270194)
  jose@setarehlaw.com
Maxim Gorbunov (SBN 343128)
  maxim@setarehlaw.com
Tyson Gibb (SBN 339154)
  tyson@setarehlaw.com
SETAREH LAW GROUP
9665 Wilshire Boulevard, Suite 430
Beverly Hills, California 90212
Telephone (310) 888-7771
Facsimile (310) 888-0109

Attorneys for Plaintiff AMY FUJISHIGE

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA CLARA

UNLIMITED JURISDICTION

| | |
|---|---|
| AMY FUJISHIGE, on behalf of herself and all others similarly situated,<br><br>*Plaintiff,*<br><br>vs.<br><br>AMAZON.COM SERVICES, LLC, a Delaware limited liability company; and DOES 1 through 50, inclusive,<br><br>*Defendants.* | Case No.: **22CV403296**<br><br>**CLASS ACTION**<br><br>**COMPLAINT**<br><br>1.  Sex Discrimination in Violation of California Fair Employment and Housing Act ("FEHA") (Cal. Gov. Code § 12940, *et seq.*)<br>2.  Failure to Prevent Sex Discrimination in Violation of FEHA (Cal. Gov. Code § 12940(k))<br>3.  Unfair Competition (Cal. Bus. & Prof. Code § 17200, *et seq.*)<br><br>**JURY TRIAL DEMANDED** |

1    Plaintiff AMY FUJISHIGE (hereinafter "Plaintiff" or "Ms. Fujishige"), on behalf of herself and

2    all others similarly situated, complains and alleges as follows:

3                                          **INTRODUCTION**

4          1.     Plaintiff brings this action against Defendant AMAZON.COM SERVICES, LLC, a

5    Delaware limited liability company (hereinafter "Defendant" or "Amazon") for alleged violations of:

6    California Government Code ("Gov. Code") section 12940, *et seq.*; the California Business and

7    Professions Code ("Bus. & Prof. Code") section 17200, *et seq.*

8          2.     Amazon is the world's largest retailer and sixth-largest company, shipping on average

9    an astronomical 1.6 million packages per day.  Throughout the United States, including California,

10   Amazon operates large warehouses, or "fulfillment centers," which have on the order of a million

11   square feet of floor space, where millions of consumer products are stored and inventoried and from

12   which deliveries are made to its customers, including its famous "Amazon Prime" two-day delivery.

13   These fulfillment centers operate by hiring thousands of hourly employees to receive, stow, count, pick,

14   pack, and load onto trucks these products quickly to keep up with Amazon's delivery schedule.

15         3.     Amazon's primary concern in these fulfillment centers is "productivity," or moving as

16   many packages of inventory as possible.  Amazon measures and enforces its productivity by imposing a

17   quota system upon its warehouse employees.  However, in striving to maximize productivity, Amazon

18   has implemented and continues to implement employment policies and procedures at its fulfillment

19   centers that, in operation, discriminate against female employees by inflicting significant adverse

20   impacts upon them, including Plaintiff, when compared to Amazon's male employees assigned to the

21   same tasks and positions.

22         4.     Failing to consider the demographic reality that, on average, in the United States,

23   including California, adult men are significantly taller than adult women, Amazon unnecessarily places

24   female employees at its fulfillment centers at a significant disadvantage compared to male employees,

25   in effect, punishing them for their generally shorter stature.

26         5.     The design and setup of Amazon's fulfillment centers, the procedures associated with

27   Amazon's "pods," and the safety policies and Amazon's Quality and Productivity Performance Policy

28   ("Productivity Policy") applicable thereto are seemingly tailored to the height and strength of the male

1   physique, rather than the female physique. In the United States, the adult population of men is

2   overwhelmingly taller than the adult female population, and at each percentile of the height distribution

3   for each of the sexes, men are taller than women.  These two simple facts work together to subject

4   women at Amazon's fulfillment centers where pods are used in the United States, including California,

5   to disproportionately more adverse employment actions and terminations than men on the basis of their

6   weekly Productivity Scores.

7       6.      Since it acquired Kiva Systems, a robotics company, in 2012, Amazon's fulfillment

8   centers have utilized pods, (i.e., movable stacks of shelves with "bins" of various sizes brought to and

9   from workstations by automated robots) to store items that are "picked" for shipping when orders come

10  in.  These pods are eight feet (96 inches) in height.  Amazon's proprietary AI algorithm tracks the

11  locations of all items on all pods and assigns each warehouse employee tasks involving these pods.

12  Warehouse employees complete these tasks by scanning items to be taken from, counted for, or placed

13  in, the pods and each must stay within a workstation, which is a fixed area with a computer touchscreen

14  interface, a rack of totes (i.e., large bins from which items will be taken to stow onto pods or into which

15  items will be placed for shipping and delivery), and a large, heavy metal stepladder fixed on a sliding

16  track for use when reaching for bins located high up the pods.  If using the stepladder does not suffice

17  for the employee to safely reach an item, then entry-level warehouse employees must call over a

18  Process Assistant—a roving, veteran employee of higher rank who assists employees when needed—to

19  reach the bin for them.

20      7.      Productivity Policy: Performance Metrics and Expectations. Amazon sets targets for

21  productivity each day and ranks warehouse employees by their "Productivity Score" on a weekly basis,

22  which takes into consideration, among other things, the number of units (i.e., warehoused items to be

23  stowed away in pods, counted for inventory, or picked for shipping to customers) scanned per hour

24  ("Units Per Hour" or "UPH") and the amount of time employees spend "off task" (i.e., not scanning

25  units) ("Time Off Task" or "TOT").  On a daily basis, Amazon expects employees to maintain a

26  grueling pace of approximately 300 UPH!  However, Amazon does not disclose any of the other factors

27  considered in Productivity Scores and only reveals UPH and TOT metrics to an employee when issuing

28  a written warning for productivity issues.

8.     Employees who need to use the stepladders or to wait for the assistance of Process Assistants more often will take more time to complete a task, on average, than those who do not, lowering the UPH and increasing their TOT.  This confers an advantage to taller people over shorter people in achieving higher Productivity Scores.

9.     <u>Productivity Policy: Punishment of Those Ranked in the Bottom 5%</u>. Amazon then uses stack ranking to effectively decimate the workforce by punishing the most disadvantaged employees. Discipline is meted out on the basis of *relative performance*, rather than by an absolute metric. Specifically, the bottom 5% in the Productivity Score rankings *each week* are subject to discipline in the form of written warnings, regardless of how well those employees may have performed objectively. Then, if an employee receives 6 written warnings of any type, or 3 productivity warnings, within a rolling period of 12 months, that employee is subject to termination.

10.     Essentially, these policies and procedures operate to unfairly punish the bottom 5% of Amazon's warehouse employees ranked by Productivity Scores, eventually culling them from the employment roster.   Those subject to this cruel policy of decimation are disproportionately women due to their overall smaller stature compared to men in the general population.  This includes Plaintiff, who stands five feet tall and was disciplined and eventually terminated for her low Productivity Scores.  The policies and practices described above and herein have had a significant adverse impact against Plaintiff and the similarly situated female employees of Amazon.  In order to keep pace with the mostly taller male employees, Plaintiff and other female employees have had to continually forgo Amazon's safety policies and procedures in order to reach items located high up on the pods in order to sufficiently maintain their Productivity Scores by keeping their UPH up and their TOT down.  But, this is a double-edged sword that dramatically increases their chances of injury.  Amazon's Productivity Policy thus puts its female employees in an impossible position, forcing them to choose between protecting their health or protecting their livelihood.

11.     Amazon has had the opportunity, the means, and the expertise to address the disparate impact these design, policy, and procedural choices in its fulfillment centers have against women.  In fact, Ms. Fujishige raised these issues to her managers whenever she was disciplined and written up for being the bottom 5% of Productivity Scores.  In its written warnings to Plaintiff, Amazon even

- 3 -

1    explicitly stated that it would work with her to help with any productivity issues she has.  Though she

2    advised her managers at length on several occasions regarding the disadvantages of having to use the

3    stepladder or call over a Process Assistant in order to reach the higher shelves, and though she proposed

4    possible solutions to them, such as having her pull only from the lower bins within her reach rather than

5    getting assigned items in higher bins, Amazon never did anything to alleviate her and other female

6    employees' height disadvantage, and to date, Amazon's female employees are still subject to the same

7    pattern and practices at its fulfillment centers.

8         12.    These policies, procedures, and practices have been in place throughout the time period

9    that pods have been in use at Amazon's fulfillment centers.  Since, to date, Amazon has refused to

10   modify them to address their discriminatory effects, their disparate adverse impacts upon Amazon's

11   female employees are continuing and ongoing.

12        13.    Based on the allegations herein, Plaintiff seeks general, special, compensatory, actual,

13   consequential, and incidental damages and interest thereon, restitution, injunctive relief, declaratory

14   relief, attorneys' fees, costs of suit, and other remedies discussed herein on behalf of herself and all

15   others similarly situated.

16                              **JURISDICTION AND VENUE**

17        14.    This Court has subject matter jurisdiction to hear this case because the Plaintiff is

18   informed and believes that the monetary damages and restitution sought in this complaint for

19   Defendants' conduct exceeds the minimal jurisdictional limits of the Superior Court of the State of

20   California.

21        15.    Venue is proper in Santa Clara pursuant to Code of Civil Procedure ("CCP") sections

22   395(a) and 395.5 in that liability arose there because at least some of the transactions that are the

23   subject matter of this Complaint occurred therein and each defendant is found, maintains offices,

24   transacts business, and/or has an agent therein.

25                        **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

26        16.    Prior to the initiation of this lawsuit, Plaintiff filed a complaint against each named

27   defendant with the California Department of Fair Employment and Housing ("DFEH") pursuant to

28   Gov. Code section 12900, *et seq.*, alleging the claims described in this complaint.  On August 26, 2022,

the DFEH issued a "right to sue" letter.  A true and correct copy of the administrative complaint and the "right to sue" letter is attached hereto as **Exhibit A**. All conditions precedent to the institution of this lawsuit have been fulfilled. This action is filed within 1 year of the date that the DFEH issued its right to sue letter.

### THE PARTIES

17.  At all times mentioned herein, and at the time the causes of action arose, Plaintiff AMY FUJISHIGE was an individual residing in the State of California.

18.  At all times mentioned herein, Defendant AMAZON.COM SERVICES, LLC, a Delaware limited liability company ("Amazon"), was and is doing business in the State of California.

19.  At all times mentioned herein, Amazon was and is an employer within the meaning of the FEHA because it did and does employ five or more persons.

20.  Plaintiff is ignorant of the true names, capacities, relationships, and extent of participation in the conduct alleged herein, of the defendants sued herein as DOES 1 through 50, inclusive, but is informed and believes and thereupon alleges that the defendants are legally responsible for the wrongful conduct alleged herein and therefore sues these defendants by such fictitious names. Plaintiff will amend the Complaint to allege the true names and capacities of the DOE defendants when ascertained.

21.  Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named defendants is responsible in some manner for, and proximately caused, the harm and damages alleged herein below.

22.  Hereinafter in this Complaint, unless otherwise specified, reference to a defendant or defendants shall refer to all defendants, and each of them. Amazon, and DOES 1 through 50, inclusive, shall hereinafter be collectively referred to as "Defendants."

23.  Upon information and belief, at all times mentioned herein, DOES 1-50 were and are employers within the meaning of the FEHA because they did and do employ five or more persons.

24.  Plaintiff alleges that each and every one of the acts and omissions alleged herein were performed by and/or attributable to all defendants, each acting as agents and/or employees, and/or under the direction and control of each of the other defendants, and that the alleged acts and failures to act

1    were within the course and scope of the agency, employment and/or direction and control.

2    **CLASS ALLEGATIONS**

3    25.    This action has been brought and may be maintained as a class action pursuant to Code

4    of Civil Procedure section 382 because there is a well-defined community of interest among the persons

5    who comprise the readily ascertainable classes defined below and because Plaintiff is unaware of any

6    difficulties likely to be encountered in managing this case as a class action.

7    26.    Relevant Time Periods.

8    a.    **FEHA Time Period**: The "FEHA Time Period" is defined as the time period

9    beginning three years prior to the filing of this action until judgment is entered.

10    b.    **UCL Time Period**: The "UCL Time Period" is defined as the time period

11    beginning four years prior to the filing of this action until judgment is entered.

12    27.    Class Definitions. Plaintiff seeks to represent the following classes in this Action:

13    **FEHA Class**: All Defendants' female employees who worked at Amazon's warehouses in
California in positions involved with processing "pods," including but not limited to pickers,
14    counters, and stowers, and who were subject to Amazon's Quality and Productivity
Performance Policy or practice during the **FEHA Time Period**.

15    **UCL Class:** All Defendants' female employees who worked at Amazon's warehouses in
16    California in positions involved with processing "pods," including but not limited to pickers,
counters, and stowers, and who were subject to Amazon's Quality and Productivity
17    Performance Policy or practice during the **UCL Time Period**.

18    28.    Reservation of Rights: Plaintiff reserves the right to amend the class definitions with

19    greater specificity by further division into subclasses or by limitation to particular issues.

20    29.    Numerosity: The class members are so numerous that the individual joinder of each

21    individual class member is impractical. While Plaintiff does not currently know the exact number of

22    class members, Plaintiff is informed and believes, and thereupon alleges, that the actual number

23    exceeds the minimum required for numerosity under California and federal law.

24    30.    Commonality and Predominance: Common questions of law and fact exist as to all class

25    members and predominate over any questions that affect only individual class members. These

26    common questions include, but are not limited to:

27    •    Whether Defendants maintained a policy or practice of requiring warehouse employees to

28    meet required Productivity Scores during the relevant time period;

1  • Whether Defendants maintained a policy or practice of taking adverse employment actions

2  against warehouse employees who fail to meet Productivity Score requirements during the

3  relevant time period;

4  • Whether Defendants had a policy or practice of taking adverse employment actions against

5  employees who are in the bottom five percent (5%) of warehouse Productivity Scores during

6  the relevant time period;

7  • Whether Defendants had a policy or practice of requiring employees who cannot, without

8  reaching above their heads, reach items located higher up in a "pod" to use stepladders or

9  call for the assistance of a Process Assistant;

10  • Whether Defendants' female warehouse employees who work on pods require the assistance

11  of stepladders or Process Assistants to complete tasks at a higher rate than male warehouse

12  employees;

13  • Whether Defendants' female employees who work on pods and to whom Productivity Score

14  requirements are applied fail to meet those requirements at a higher rate than male

15  warehouse employees;

16  • Whether Defendants' female warehouse employees who work on pods are disciplined at a

17  higher rate than male warehouse employees to whom the Productivity Policy is applied;

18  • Whether Defendants' female warehouse employees who work on pods are terminated at a

19  higher rate than male warehouse employees to whom the Productivity Policy is applied;

20  • Whether Amazon's policy or practice of requiring warehouse workers to meet Productivity

21  Score requirements has a disproportionate adverse impact upon Defendants' female

22  warehouse employees who work on pods;

23  • Whether Amazon's policy or practice of writing up, reprimanding, and terminating

24  warehouse employees ranked in the bottom five percent (5%) of Productivity Scores

25  disproportionately impacts Defendants' female warehouse employees; and

26  • Whether class members are entitled to restitution of money or property that Defendants may

27  have acquired from them through unfair competition.

28  ///

31.   <u>Typicality</u>: Plaintiff's claims are typical of the other class members' claims. Plaintiff is informed and believes, and thereupon alleges, that Amazon has a policy or practice of failing to comply with the Government Code and Business and Professions Code as alleged in this complaint.

32.   <u>Adequacy of Class Representative</u>: Plaintiff is an adequate class representative in that she has no interests that are adverse to or otherwise conflict with the interests of absent class members and is dedicated to vigorously prosecuting this action on their behalf. Plaintiff will fairly and adequately represent and protect the interests of the other class members.

33.   <u>Adequacy of Class Counsel</u>: Plaintiff's counsel are adequate class counsel in that they have no known conflicts of interest with plaintiff or absent class members, are experienced in class action litigation, and are dedicated to vigorously prosecuting this action on behalf of Plaintiff and absent class members.

34.   <u>Superiority</u>: A class action is vastly superior to other available means for fair and efficient adjudication of the class members' claims and would be beneficial to the parties and the Court. Class action treatment will allow a number of similarly situated persons to prosecute their common claims simultaneously and efficiently in a single forum without the unnecessary duplication of effort and expense that numerous individual actions would entail. In addition, the monetary amounts due to many individual class members are likely to be relatively small and would thus make it difficult, if not impossible, for individual class members to both seek and obtain relief. Moreover, a class action will serve an important public interest by permitting class members to effectively pursue the recovery of monies owed to them. Further, a class action will prevent the potential for inconsistent or contradictory judgments inherent in individual litigation.

## GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Amazon's Fulfillment Centers: "Pods" and Procedures

35.   At each of Amazon's modern fulfillment centers, the inventory is stored on tens of thousands of movable storage shelves called "pods," simple metal, four-legged platforms with accessible shelves on all four sides. They have a square base of about approximately 3.25 feet x 3.25 feet (40 in. x 40 in.) and are about 8 feet (96 in.) tall.  Starting about a foot from the ground, they hold varying numbers of yellow plastic shelves containing one or more "bins," depending on the item size,

which will hold one or more items, also depending on the item size.  The bottom 12 inches of the pod is an empty space to allow Amazon's "Kiva" robots to pass underneath, lift, and move the pod as needed. (*See* Figures 1 and 2, below.)





*Fig. 1. Amazon's "pods."*[1]        *Fig. 2. Kiva robot carrying pod.*[2]

36.      The pods are moved around the warehouse by robots known commonly as "Kivas," from the company that developed them, Kiva Systems, purchased by Amazon in 2012 and renamed "Amazon Robotics."  The Kivas are numbered, orange-colored, wheeled robots that measure about 2.5 feet by 2 feet at their base and about a foot in height, weighing around 250 pounds, and capable of lifting up to 1,000 pounds. They move autonomously through a fulfillment center picking up, transporting, and placing down pods at 3-4 miles per hour.  (*See* Figure 2, above.)

37.      There are three positions primarily working with or on the pods: stower, counter, and picker.  In simple terms, a "stower" puts new inventory that has arrived at the fulfillment center onto the pods, a "counter" scans the items on a particular pod for inventory purposes, and a "picker" takes items off the pods when orders come in and sends them out to be packed and shipped.  These employees are stationed at workstations at fixed locations in the warehouse, and the Kiva robots bring the pods to and from these stations.  (*See* Figure 2, above, and Figure 3, below.)

///

///

///

///

---

[1] https://i0.wp.com/www.allaboutlean.com/wp-content/uploads/2020/03/Kiva-Pod-Illustration.png?resize=300%2C261&ssl=1
[2] https://www.allaboutlean.com/amazon-fulfillment-1/amazon-kiva-with-pod/



_Fig. 3_. Male picker at ARSAW Workstation.[3]   _Fig. 4_. Female stower on stepladder at workstation.[4]



_Fig. 5_. Female picker scanning item picked from pod to place in tote on rack at workstation.[5]

38.     There are two types of workstations that employees who work with the pods work on, "Universal" and "ARSAW" stations.  Both stations consist of a flat, rectangular area a few feet across, demarcated with colored lines, in front of which the pods carried on Kivas stop so that they may be stowed, counted, or picked.  The station is flanked on one side by a metal rack with sloped shelves that hold totes that arrive via conveyor belts and get pushed onto the shelves therefrom.  Fastened at the end the metal rack at the front of the station are a computer terminal consisting of a touchscreen monitor on an adjustable swingarm and a portable hand-held barcode scanner.  The station flanked on its other side in front by a large, heavy, industrial metal stepladder (with two or three steps, depending on the type of

---

[3] https://www.allaboutlean.com/amazon-kiva-storage-strategies/picker4/
[4] https://www.vox.com/the-goods/2019/6/26/18758599/amazon-fulfillment-center-tour-robots-workers
[5] https://www.allaboutlean.com/amazon-fulfillment-1/amazon-robotic-pick-station/

workstation, and handrails reaching about shoulder height) that is fixed on a track running horizontally along the front of the workstation along which it can slide. This stepladder must be used by employees to reach bins that lie above the employee's head and must be kept within a demarcated square in the other forward corner of the workstation when not in use. (See Figures 3 and 5, above, and Figures 6 and 7, below.)

39.     The Universal Station is flush with the main warehouse floor, and its stepladder has three steps, with the highest about 2.5 feet from the ground.

40.     The ARSAW station is a platform that rises about a foot above the main floor upon which the Kiva robots travel so that the bottom of the lowest shelf on pod is flush with the floor of the ARSAW station when the Kiva robots carrying the pods pull up in front of it. Its stepladder has two steps, with the highest about 1.5 feet from the station floor.

41.     At each point, from arrival to shipping, all items are scanned whenever moved from one place to another. The location of each item is recorded in Amazon's system and a proprietary algorithm coordinates the Kiva robots' movements and each employee's assigned items to interact with at any given time. First, trucks arrive at the inbound docks of the fulfillment center, where they are unloaded. Then, the cardboard boxes are moved to the receiving area, where they are scanned and opened and the individual goods are put into boxes called "totes" or on carts, which are then distributed to the area where the items will be stowed on pods.

42.     Stowing. Kiva robots bring pods with available space to stower stations, which look very similar to the picking stations. (See Figures 3, 4, and 5, above; Figure 6, right; and Figure 7, below.) A stower receives totes from the inbound area, scans an item from the tote, and then places it on any free slot on the pod. This is known as *chaotic storage* since the placement of items is based on available space and not predetermined. The stower adds the item, while a motion sensor tracks the location in the pod. After inserting the item into the pod and clicking confirm on the screen at his or her workstation, the stower gets the next location or pod for the next item.

///

///

///

CLASS ACTION COMPLAINT

43.   _Counting._  With millions of items in every fulfillment center and thousands in flux at any given time, inventory in pods constantly need to be updated or confirmed.  Counters are employees assigned to make these counts.  At a workstation similar to stowers and pickers, counters receive pods via Kiva robots.  A counter is assigned by a manager or Process Assistant to perform one of three types of counts and then selects the type from the menu on the computer monitor. A handheld scanner is then used to enter the count information. For a "Simple Bin Count," the counter looks at the number of items in the bin and then enters that number on the scanner. The scanner may then prompt the counter to re-count the bin by physically removing the items. For a "Cycle Count," the counter must physically scan each item to record the number of items in the bin.



_Fig. 6_. Pod at workstation for picking.[6]

44.   _Picking._  Processing outbound packages, or shipping, comprises the largest part of the work at fulfillment centers. This begins with the picking process, wherein ordered goods are picked from pods and sent out to be packed and then loaded onto trucks for delivery. First, a Kiva robot retrieves the pod which contains the item to be picked and brings it to the assigned picker station. After it arrives, a message pops up on the computer monitor identifying the item to pick. A light illuminates that bin on the pod, and the computer monitor displays the location as well. After picking the item out of the bin, the picker scans the item and places it in the correct tote on the rack. After placing the item in the tote and pressing the lighted button above it, the next item to be picked then appears on the monitor. Filled totes get pushed down the rack towards the back of the workstation, and new totes arrive the conveyor belt next to the monitor, and the process repeats.

[6] https://i.redd.it/jvdlkeyvrci61.jpg

CLASS ACTION COMPLAINT

**Amazon's Fulfillment Centers: "Pods" and Safety Policies**

45.    Amazon has a number of safety policies in place that must be followed in connection with working with pods. Failure to comply with these policies can subject an employee to discipline, up to termination. Accordingly, these policies affect the manner in which employees who may deal with pods complete their tasks and, ultimately, how productive they can be.

46.    <u>Overreaching</u>. Employees are not to lift their arms any higher than their heads to place or retrieve an item. If caught doing so, employees are admonished not to do so and to use the stepladder to lift or retrieve an item properly.

47.    <u>Industrial Stepladders</u>. The sliding metal industrial stepladder of 10-15 lbs. is affixed to each station on a track and must be used to reach for bins or items that lie above the employee's head. Failing to do so means that the employee is overreaching, which can subject an employee to discipline. If any assigned items are in bins above a certain level (about 2/3 of the way up from the bottom the pod) the monitor displays a notification to "Use Ladder." When not in use, the stepladder must be parked within a square that is demarcated by caution tape on the floor of the front corner of the workstation on the side opposite the tote rack and computer monitor. When an employee must use the stepladder, he or she must reach over to where the stepladder is stationed and slide it horizontally along the track to the correct position in front of the pod underneath the bin to be reached. Then, the employee must climb the stepladder to place, scan, or retrieve the item and, while doing so, must maintain at least three points of contact with the stepladder at all times. After stowing, picking, or counting the item, the employee descends and disembarks from the stepladder, again, maintaining 3 points of contact. Finally, once use of the ladder is complete, the stepladder must be pushed back within the square taped-off area where it is kept in the station, since leaving it out in front of the pod is considered a safety hazard, and the stepladder may be blocking the next bin to be accessed.

///
///
///
///
///



*Fig. 7. Male stower at Universal Workstation showing industrial stepladder.*[7]

48.    Process Assistant. These are roving employees, who, due to their demonstrated proficiency on the warehouse floor, assist stationed employees with whatever they need.  They receive information on their laptop about which employees are unproductive, and then they observe those from afar for several minutes to compare the information on their laptop to the actual work being done. They would thereafter give pointers to the employees. They also send messages or speak to employees in person if those employees needed to go to a different station or do a different task.  If a bin is too high to reach even with the stepladder, or some other issue arises while stowing, counting, or picking, employees are to call a Process Assistant over to help with the issue.  However, since only one Process Assistant was assigned to each floor, they were hard to track down, and waiting for one could use up precious time.

### Amazon's Fulfillment Centers: Productivity Policy and Enforcement

49.    To meet the demand of shipping 1.6 million packages per day, Amazon requires employees in its Fulfillment Centers to meet a quota[8] of items processed hourly. If an employee fails to meet the quota, he or she can be subject to an adverse employment action.

---

[7] https://www.dallasnews.com/business/retail/2021/10/17/warehouse-jobs-are-plentiful-fewer-takers-ahead-of-the-holiday-shopping-rush/

[8] The authors of California Assembly Bill 701, which was enacted in 2021 and which regulates the use of quotas in warehouses, pointed specifically to Amazon's unsafe work speed and quotas as a key motivator for the legislation. Therefore, California Labor Code §2100(h), which went into effect on January 1, 2022, defines a "quota" as a "work standard under which an employee is assigned or required to perform at a specified productivity speed, or perform a quantified number of tasks, or to handle or produce a quantified amount of material, within a defined time period and under which the employee may suffer an adverse employment action if they fail to complete the performance standard."

50.     **Productivity Policy**.  Amazon uses a suite of productivity metrics and disciplinary policies and practices, and incentives to maintain the quotas of its workforce, which come under an omnibus "Quality and Productivity Performance Policy" (hereinafter, "Productivity Policy").  Plaintiff is informed and believes, and thereupon alleges, that Amazon's Productivity Policy entails tracking all employees based on several variables, including: their number of units scanned per hour (hereinafter "Units Per Hour" or "UPH"); the non-productive time spent in between scanning each unit (hereinafter, "Time Off Task" or "TOT"); and other undisclosed factors to produce a numerical score which represents an employee's productivity during a given period (hereinafter, "Productivity Score").  On a weekly basis, Amazon ranks the warehouse employees by Productivity Scores, and those who are ranked in the bottom 5% are written up for poor performance, regardless of how objectively well they performed or how closely their performance compared to others.  This is in keeping with *stack ranking*, a system in which employees' performances are reviewed on a curve, with employees ranking at the bottom being subject to discipline or other adverse employment action.

51.     <u>Units Per Hour</u>.  This number represents the number of items scanned per hour a worker is "on" at their station. So, for instance, if a worker is assigned to be a picker for 4 hours in their shift, they are expected to pick in full a number of items equal to four hours multiplied by their expected UPH. These quotas can be brutal—on the order of 300 UPH (i.e., 5 units per minute, or one unit scanned every 12 seconds)—standard.  In the 4-hour picking example above, the employee would be expected to pick 1,200 items total.

52.     Amazon has the power to adjust the UPH requirements.  The UPH requirement is set regionally and also varies depending on the day or the type of item being processed. For example, if picking mostly smaller items, the expected UPH may be 306, but if picking mostly medium-sized items, which should be inherently more difficult due to their size, the expected UPH may be 297.

53.     <u>Time Off Task</u>.  If an employee pauses or breaks from performing certain tasks, such as scanning, that time is tracked. After a certain amount of time, that time is logged as "Time Off Task" (hereinafter, "TOT").  TOT represents all such time before the next assigned item is scanned. After accumulating a certain amount of TOT, employees receive notifications at their workstation indicating they have spent too much TOT, and they can be disciplined or fired for accumulating too much TOT.

54.     Prior to June 2021, there was a 30-minute TOT limit per day, after which workers faced disciplinary action.  If there was more than 120 minutes of TOT in a day, employees were automatically terminated. Amazon routinely measures its employees' performance in granular detail and disciplines those who fall even slightly short of expectations, even during the same shift. During a one-year period ending April 2020, Amazon issued over 13,000 "disciplines" in one warehouse alone, according to court papers Amazon filed.  Since June 2021, Amazon claims to have modified its TOT policy to average TOT over an unspecified longer period of time before disciplining employees.[9]

55.     **Progressive Discipline**.  If an employee has 6 written warnings in a rolling 12-month period, his or her employment will be terminated.  Upon information and belief, the number of written warnings is reduced by one for each 30-day period of good behavior, i.e., with no written warnings issued.  Moreover, Plaintiff was told by Amazon that an employee can also be terminated if he or she has 3 productivity write-ups (first written, second written, and final written).

56.     **Promotions**.  Plaintiff is informed and believes, and thereupon alleges, that in order to be considered for promotions or pay increases, the threshold UPH is on the order of 400 (i.e., nearly 7 units per minute, or one unit every 9 seconds).  The next rank of employment for a warehouse employee, such as Plaintiff was, would be that of a Process Assistant.  Process Assistants are proficient with the operations of Fulfillment Centers, as demonstrated by their consistently high Productivity Scores, and are not assigned to any one workstation during shifts, but rather roam freely among the stations and assist and troubleshoot wherever they are needed.  Other positions that helped with training the employees are a Process Guide and Learning Ambassador (veteran warehouse employees). Plaintiff has observed that all the Process Assistant, Process Guide, and Learning Ambassador that she interacted with at her Fulfillment Center were tall men.

## Plaintiff's Experience at Amazon's Fulfillment Center

57.     Plaintiff Amy Fujishige is a woman, five feet in height, who worked for Amazon at its Fulfillment Center in Sacramento, California from about September 16, 2020, through about July 8, 2021 as a picker and counter.

///

---

[9] https://www.businessinsider.com/amazon-changing-how-it-measures-time-off-task-metric-2021-6

58.     During Ms. Fujishige's first weeks employed by Amazon, she learned of Amazon's Productivity Policy.  However, when Plaintiff asked her manager, Ashley Hinnebusch (hereinafter, "Ashley") about the other factors besides UPH and TOT that were used in the algorithm to produce Productivity Scores, Ashley stated, "I don't even know the extensiveness of" the algorithm Amazon used.  Plaintiff was never informed of all the factors that are weighed to produce Productivity Scores.

59.     One of Plaintiff's job assignments was picker, where she began to run into issues regarding her Productivity Score almost immediately. Plaintiff, being five feet tall, was not able to pick and scan items at the top of each pod without assistance from a Process Assistant or violating the safety policy against overreaching for items over her head.  Having to meet the strict Productivity Score standards and stay out of the bottom 5% of Productivity Scores, Plaintiff would often try to grab high-up items without using the stepladder to keep the amount of time spent retrieving an item at a minimum. When caught doing so, Plaintiff would be reprimanded by a Learning Ambassador or people from the safety department for "overreaching." Ms. Fujishige would be reminded on her monitor of the requirement of a ladder for employees who could not easily reach items at the top of the pod.

60.     As a result of being required to move the industrial stepladder, to climb and descend it using 3 points of contact at all times in order to access the items on the top shelves of each pod, and to move the stepladder back to its taped-off storage area after use, Plaintiff, due to her shorter stature, was forced to spend more time to complete the same tasks as other, taller employees, resulting in a lower average UPH measurement and lowering her Productivity Scores.

61.     As a result of being required to call over a Process Assistant to help pick or count items on the highest shelves of a pod whenever Amazon's algorithm assigned those bins because the industrial stepladder provided at the workstations was insufficient to allow Plaintiff to reach them due to her height, Plaintiff was forced to spend more time completing the same tasks as other, taller employees, resulting in a lower average UPH measurement and a higher average TOT measurement, lowering her Productivity Scores.

62.     These barriers to performance led to Plaintiff being ranked in the bottom 5% of Productivity Scores on several occasions and to Plaintiff receiving automatic written warnings.  Plaintiff was put between a rock and hard place: either she could continue to follow the safety policies and use

the industrial stepladder and call for a Productivity Assistant and wait precious seconds to minutes every time an item was out of reach, adding to her TOT and lowering her UPH, or she could resort to workarounds, such as overreaching anyway or skipping the processing of high-up items, in order to keep her UPH up and her head above water. Unfortunately, most of the of the time Ms. Fujishige was forced to do the latter just to survive on any given week.

63.     Ashley Hinnebusch, Ron Steers, Devin Ochoa, among other managers at the Fulfillment Center where Plaintiff worked have stated numerous times—and Amazon had a written policy—that Amazon would work with Plaintiff and other employees to remove barriers to productivity once brought to Amazon's attention. However, after several occasions where Ms. Fujishige did so, Amazon never made any attempt to address the problems faced by female employees.

64.     On or around approximately February 24, 2021, Plaintiff mentioned to her supervisor Ron Steers, that using the required industrial stepladder reduces her productivity because of the additional time and physical strain it required her to expend. Amazon did not respond to or remedy Plaintiff's concerns.

65.     On or around approximately April 2, 2021, Plaintiff again mentioned to Ashley how using the stepladder automatically lowers her and similarly situated employees' productivity because of the extra work required. Ashley replied that Plaintiff's concerns were invalid because of the problems that a taller person could have reaching lower-placed items. This answer is illogical since a taller person would not need to use the stepladder at all in order to reach bins sitting lower to the ground and since having to use a stepladder or having to wait for a Productivity Assistant to come over and help is what caused the delays in scanning items.

66.     On or around April 9, 2021, Plaintiff further mentioned to Ashley that her productivity was lower because her stepladder would stick in its tracks, causing Plaintiff to have to expend even more time than usual wrangling the ladder to move it into position before she could pick items from the top shelf of the pod. Ashley replied that she did not "even think about [the condition of the stepladder] because taller people don't need to use it." Plaintiff believes that Amazon never fixed her stepladder despite her direct request to Ashley to do so to help increase her productivity.

///

67.    On or around April 21, 2021, Plaintiff again mentioned to Ashley that one of the largest barriers to increasing her productivity was the required use of industrial stepladders due to the height of the warehouse pods, because using the stepladder takes more time and energy, thus lowering her and similarly situated employees' Productivity Scores.  The next day, a Process Assistant approached Ms. Fujishige and instructed her not to go to her manager to request any accommodations.  The Process Assistant asked Plaintiff what he could do to help improve her productivity. Ms. Fujishige replied that Amazon could put the items that she was assigned to pick within arm's-reach of her.  However, nothing came of this suggestion, and Plaintiff still had the same frequency of high-placed, out-of-reach bins tasked to her for the remainder of her employment.

68.    Plaintiff and the putative class members were continually pushed to meet the Amazon's Productivity Score threshold and written up for being unable to keep up with the imposed standards, all of which caused significant stress to Plaintiff and the putative class.

69.    Plaintiff and the putative class were expected to meet the same Productivity Score requirements as all other warehouse employees despite male employees being less likely to require the use of industrial stepladders or Productivity Assistants to aid in their tasks.

70.    Because of the adverse effects of the application of Amazon's UPH, TOT, Productivity Score practices and policies, Plaintiff was given several written warnings for failing to meet the Productivity Score threshold or exceeding the allotted thirty minutes of TOT.

71.    Throughout Ms. Fujishige's employment, she would continually observe female coworkers of similar height being written up for having lower Productivity Scores and longer TOT scores. Plaintiff also spoke with several coworkers and noticed that the vast majority of those who were written up in accordance with Productivity Policy were women. Plaintiff is informed and believes, and thereupon alleges, that her female coworkers were disciplined at a disproportionately higher rate than male coworkers.

72.    After receiving six written warnings for failing to meet the requirements of Amazon's Quality and Productivity Performance Policy, Plaintiff's was terminated in accordance with Amazon's progressive discipline policy on July 8, 2021.

73.    Plaintiff suffered lost income as a result of being terminated, and she and the putative

- 19 -

CLASS ACTION COMPLAINT

1    class suffered stress, lost income, emotional distress, anxiety, and an increased rate of physical injuries

2    as a result of the adverse discriminatory impact that the operations and procedures, safety policies,

3    Productivity Policies at its Fulfillment Centers and warehouses had upon them, all in violation of the

4    law.

5    **Differences Between the Physical Attributes of Adult Men and Women in the United States**

6         74.    **Height** is the measure of how high the top of one's head from the ground when standing

7    feet together, back straight, looking straight ahead.  In the context of Amazon's safety policies and

8    procedures, this would be the height beyond which employees are not allowed to reach to place or

9    retrieve an item from the bin.  To do so would be considered "overreaching" and is not allowed due to

10   the risk of injury.  For reference, Amazon's pods are 96 inches (8') tall.

11        75.    Women's Height.  For women in the United States who are 20 years of age and older:

12             • 5th percentile (short) have a height of 59 inches (4' 11");

13             • 50th percentile (median) have a height of 63.5 inches (5' 3.5"); and

14             • 95th percentile (tall) have a height of 67.9 inches (5' 7.9").[10]

15        76.    Men's Height.  For men in the United States who are 20 years of age and older:

16             • 5th percentile (short) have a height of 64.1 inches (5' 4.1");

17             • 50th percentile (median) have a height of 69 inches (5' 9"); and

18             • 95th percentile (tall) have a height of 73.8 inches (6' 1.8").[11]

19        77.    **Standing Vertical Grip Reach** (hereinafter, "SVGR") is the measure of how high one

20   can reach standing straight up, feet together, back straight, with arms raised straight up and hands

21   closed with fingers in a grip position.  In the context of Amazon's safety policies and procedures, this

22   would be the height beyond which employees simply could not reach, requiring the use of a ladder or

23   assistance of others as a matter of course.  This is exacerbated by the fact that there is a gap of a few

24   inches between the side of the pod facing the workstation and the front of the workstation, and, thus, the

25   highest that an employee can functionally reach is actually a few inches below their SVGR.

26

27   [10] Fryar CD, Carroll MD, Gu Q, Afful J, Ogden CL. (2021). Anthropometric reference data for children
     and adults: United States, 2015–2018. National Center for Health Statistics. *Vital Health*

28   *Stat* 3(46).
     [11] *See* fn. 10.

78.   <u>Women's SVGR</u>. For adult women in the United States:

- 5th percentile (short) have a SGVR of 71.34 inches (5' 11.34");
- 50th percentile (median) have a SVGR of 77.32 inches (6' 5.32"); and
- 95th percentile (tall) have a SVGR of 84.21 inches (7' 0.21").[12]

79.   <u>Men's SVGR</u>. For adult men in the United States:

- 5th percentile (short) have a SVGR of 77.68 inches (6' 5.68");
- 50th percentile (median) have a SVGR of 84.21 inches (7' 0.21"); and
- 95th percentile (tall) have a SVGR of 91.9 inches (7' 7.9").[13]

**The Design, Policies, and Procedures of Amazon's Fulfillment Centers Have a Discriminatory Effect Against Its Female Employees**

80.   The design, policies, and procedures implemented at Amazon's Fulfillment Centers disparately impact its male and female employees, heavily favoring the former over the latter.

81.   For instance, the pods are 8 feet tall, placing the top-level bins within unassisted reach SVGR of the tallest (95th percentile) men but not the tallest women.



*Fig. 8. Female warehouse employee walking among pods.*[14]

---

[12] Gordon, Claire C. et al. (2014). *2012 Anthropometric Survey of U.S. Army Personnel: Methods and Summary Statistics.*
[13] *See* fn. 12.
[14] https://techxplore.com/news/2019-02-amazon-collaborative-robots-peek-future.html

82.     Furthermore, the shortest men (5th percentile) have about the same SVGR as the 50th percentile of women, meaning that *half* of the adult female population has a SVGR below that of the 5th percentile of men, meaning that half of women would require more frequent assistance from the stepladder or a Process Assistant than the shortest men.

83.     Moreover, the 50th percentile of men have the same SVGR as the tallest women (95th percentile). This gives the taller half of men an advantage over nearly all women.

84.     Yet, despite these known differences between its male and female employees, and the design of its pods and fulfillment centers seemingly optimized to the general physical attributes of men (including but not limited to height) rather than that of women, Amazon holds both groups to the exact same standards of productivity and callously decimates employees in the bottom 5% of weekly Productivity Scores.

85.     Because Amazon's female employees must use the stepladder, require assistance from Process Assistants, and risk injury by ignoring safety policies and procedures more frequently than male employees due to the physical differences between the two sexes, their UPH is reduced and their TOT is greater overall, leading to lower Productivity Scores in general, placing a disproportionate number of women in the bottom 5% of Productivity Score rankings.

86.     As Plaintiff has observed, mostly petite women received discipline for issues with Productivity Scores. Plaintiff hardly, if ever, observed male employees similarly facing productivity issues. Plaintiff herself was forced to ignore safety policies and procedures, greatly increasing her risk of injury, just to maintain her UPH to stay out of the bottom 5% of Productivity Score rankings on a weekly basis. In fact, Plaintiff sustained injury to her foot on the job due to repetitive motions she made lifting items that were too heavy for her. But, rather than modify its operations to make conditions safer and attuned to the physical limits of its employees, Amazon simply squeezed as much work as possible from them until they could no longer work due to injury or exhaustion, causing such employees to quit or allowing Amazon to terminate them for being in bottom 5% of Productivity Scores. Amazon discarded and replaced the broken bodies of its employees, especially women, like rusty, brittle cogs fatigued from overuse.

///

**Despite the Existence of Alternative Employment Practices That Would Reduce the
Discriminatory Impact Against Its Female Employees, Amazon Has Refused to Adopt Any**

87.    Amazon has been aware that the operation of its fulfillment centers disproportionately affects its female employees, having been so advised by Plaintiff herself, and from its disciplinary actions against other female employees. Yet, Amazon has not adopted, and refuses to adopt, simple changes in its policies and procedures that would eliminate their disparate impact upon women.

88.    Consideration of Employee Height by Assignment Algorithm. Amazon's algorithm that assigns tasks to stowers, counters, and pickers does so based solely upon the orders that come in at a given time and proximity of a pod containing that item to an employee. This randomness of the bin assignments means that tasks for bins that are out-of-reach for most women are assigned to women at the same rate as men. If the algorithm would simply consider the height of an employee (without needing to factor the gender of the employee and, thus, remaining neutral) when assigning bins, then taller employees could be assigned tasks on bins in the uppermost two-thirds (or other appropriate section) of the pods while shorter employees would be likewise assigned tasks on bind in a lower portion. If, for example, a pod that has had the lowermost portion picked still has bins in its upper portion that need to be picked, then the algorithm could have the robot move that pod to a taller employee next to finish picking those upper bins. Amazon could simply collect the height data for each of its fulfillment center employees and program the algorithm accordingly without having to alter the configuration of the pods or the layout or tooling of its Fulfillment Centers. This would mitigate the general height advantages of men over women, reducing the disparate impact, while simultaneously having the added bonus of increasing the productivity and safety of its female employees.

89.    Repeal/Reform of the Decimation Policy. Amazon's cruel policy of decimating its workforce by punishing the those who rank at the bottom 5% of productivity scores week after week, regardless of absolute performance, also contributes to the disproportionate discipline and termination of female employees. The arbitrary nature of the selection for written warnings on a relative performance scale can lead to arbitrary splits among employees who performed at essentially the same UPH or who have only slightly different Productivity Scores, with some being punished and others not along the bottom 5% line. This is essentially stack ranking, and since women are at a disadvantage

physically with respect to how Amazon's operations with pods are designed, they disproportionately bear the brunt of the punishment compared to men.  This policy of decimation makes an already stressful, physically grueling job even more difficult for women in that it perversely pits them—the most vulnerable employees—against each other in a cruel competition just to avoid termination, while protecting those who need the least amount of help.  Amazon could and should get rid of this policy entirely and instead set realistic productivity goals based upon absolute quotas rather than relative performance.  This would reduce worker attrition and preserve its dwindling pool of potential labor, which is a problem Amazon's fulfillment centers now face.[15]  Most importantly, it would keep women from being disproportionately targeted for discipline and termination based upon relative productivity.

90.     <u>Transparency in Performance Evaluation</u>. Amazon needs to be more transparent with how it evaluates employee performance with respect to Productivity Scores.  Employees do not receive any feedback, positive or negative, until they are given a written warning.  Moreover, even when receiving written warnings, employees are not provided all of the factors and data upon which their Productivity Scores are based, other than Units Per Hour and Time Off Task.  Employees may be given general guidance by Process Assistants and others, but they have no access to their own data and evaluation to see where and how they need to improve.  Left in the dark, they have no recourse but to ignore safety policies, skip using the restroom, and take whatever shortcuts they can in order to stay out of the bottom 5% of Productivity Score rankings.  This is par for the course for female employees, including Plaintiff, who have to push themselves harder just to keep up with the men due to their overall smaller stature.

91.     The discriminatory effects described above have had and will continue to have a disparate impact upon Defendants' female employees because Amazon continues to use the same problematic procedures and policies that it has ever since it implemented the use of pods and robots in its fulfillment centers.

///

///

///

---

[15] https://www.vox.com/recode/23170900/leaked-amazon-memo-warehouses-hiring-shortage

**FIRST CAUSE OF ACTION**

**SEX DISCRIMINATION**

**IN VIOLATION OF CAL. GOV. CODE § 12940, *ET SEQ.***

**(Plaintiff and the FEHA Class against all Defendants)**

92.     Plaintiff re-alleges and incorporates all preceding paragraphs as though fully set forth herein.

93.     FEHA prohibits an employer from discharging a person from employment or from discriminating against a person "in compensation, or in terms, conditions, or privileges of employment" on the basis of the person's sex. California Government Code ("Gov. Code") § 12940(a). As used in FEHA, Sex "includes, but is not limited to, a person's gender. 'Gender' means sex, and includes a person's gender identity and gender expression. 'Gender expression' means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth. Gov. Code § 12926(r)(2).

94.     Amazon was and is an employer within the meaning of the FEHA because it did and does employ five or more persons.

95.     Upon information and belief, DOES 1-50 were and are employers within the meaning of the FEHA because they did and do employ five or more persons.

96.     Defendants have discriminated against Plaintiff and the putative class of similarly situated female employees in violation of FEHA because Amazon's policies subjected them to different and adverse employment actions as a result of their sex, and they have suffered disparate impacts as a result of Amazon's Quality and Productivity Performance Policy, including but not limited to its policies or practices regarding UPH, TOT, and Productivity Scores, in conjunction with the design of its pods and safety policies and procedures at its fulfillment centers.

97.     Plaintiff alleges that Defendants' uniform application of the aforementioned policies has had and continues to have a disparate impact against Plaintiff and the putative class of female employees on the terms, conditions, and privileges of their employment. Defendants' practices and/or policies are not justified by business necessity or, if they could be justified, less discriminatory alternatives exist.

1   98.   Plaintiff is informed and believes, and thereupon alleges, that statistics will support,

2   among other things, that: (1) female employees suffer disparate impacts because of Amazon's Quality

3   and Productivity Performance Policy, including but not limited to its policies or practices regarding

4   UPH, TOT, and Productivity Scores, in conjunction with the design of its pods and safety policies and

5   procedures; (2) female warehouse employees are written up for productivity issues at a higher

6   percentage rate than male warehouse employees; and (3) female warehouse employees are terminated

7   at a disproportionately higher rate than male warehouse employees.

8   99.   At all relevant times, Defendants had actual and constructive knowledge of the

9   discriminatory conduct described herein.

10   100.   As a direct and proximate result of Defendants' violation of the FEHA, Plaintiff and the

11   putative class have suffered and will continue to suffer damages in an amount within the jurisdiction of

12   this court, the exact amount to be proven at trial.

13   101.   As a further direct and legal result of the acts and conduct of Defendants, Plaintiff and

14   the putative class have been caused to, and did, suffer and continues to suffer severe emotional and

15   mental distress and anguish, humiliation, embarrassment, anger, shock, pain, discomfort, and anxiety,

16   all of which is substantial and enduring. The exact nature and extent of these injuries is presently

17   unknown to Plaintiff, who will pray leave of court to assert the same when they are ascertained.

18   102.   Pursuant to Gov. Code section 12965(b), Plaintiff is entitled to her attorneys' fees and

19   costs in prosecuting this lawsuit.

20   **SECOND CAUSE OF ACTION**

21   **FAILURE TO PREVENT DISCRIMINATION**

22   **IN VIOLATION OF GOV. CODE § 12940(k)**

23   **(Plaintiff and the FEHA Class against all Defendants)**

24   103.   Plaintiff realleges and incorporates all preceding paragraphs, as though set forth in full

25   herein.

26   104.   At all times mentioned herein, Gov. Code section 12940, *et seq.*, was in full force and

27   effect and binding on Defendants. Gov. Code section 12940(k) requires Defendants to take reasonable

28   steps to prevent discrimination from occurring.

105. Amazon was and is an employer within the meaning of the FEHA because it did and does employ five or more persons.

106. Upon information and belief, DOES 1-50 were and are employers within the meaning of the FEHA because they did and do employ five or more persons.

107. As alleged herein, Plaintiff and the putative class members suffered unlawful discrimination at the hands of Defendants.

108. Defendants failed to take all reasonable steps to prevent such discrimination in violation of Gov. Code section 12940(k).

109. Defendants failed to take appropriate and/or reasonable steps to train and/or monitor its employees, supervisors and/or managers regarding sex discrimination by failing to enforce a policy against unlawful discrimination and by failing to take prompt and appropriate disciplinary action against the perpetrators of discrimination and to remedy any discriminatory policies.

110. As a direct and proximate result of Defendants' failure to take all reasonable steps to prevent discrimination, Plaintiff and the putative class have suffered and will continue to suffer damages in an amount within the jurisdiction of this Court, the exact amount to be proven at trial. Such damages include loss of salary and other valuable employment benefits, prejudgment interest and interest on the sum of damages at the legal rate, and other consequential damages, including damages for shame, humiliation, mental anguish, and emotional distress caused by the conduct of Amazon.

111. Pursuant to Gov. Code section 12965(b), Plaintiff is entitled to her attorneys' fees in prosecuting this lawsuit.

**THIRD CAUSE OF ACTION**

**UNFAIR COMPETITION**

**IN VIOLATION OF BUS. & PROF. CODE § 17200, *ET SEQ.***

**(Plaintiff and the UCL Class against all Defendants)**

110. Plaintiff realleges and incorporates all preceding paragraphs, as though set forth in full herein.

112. Cal. Bus. & Prof. Code section 17200 *et seq.* (also referred to herein as the "Unfair Business Practices Act," "Unfair Competition Law," or "UCL"), prohibits unfair competition in the form

CLASS ACTION COMPLAINT

1   of any unlawful, unfair, or fraudulent business acts or practices.

2        113.   Bus. & Prof. Code section 17204 allows a person injured by the unfair business acts or

3   practices to prosecute a civil action for violation of the UCL.

4        114.   Defendants committed acts of unfair competition as defined by the Unfair Business

5   Practices Act, by engaging in the unlawful, unfair and fraudulent business acts and practices described in

6   this Complaint, including, but not limited to: violation of Government Code section 12940 *et seq.*

7   pertaining to sex discrimination and failure to prevent sex discrimination.

8        115.   The violations of these laws and regulations, as well as of the fundamental California

9   public policies underlying them, serve as unlawful predicate acts and practices for the purposes of Bus.

10   & Prof. Code section 17200 *et seq.*

11        116.   Additionally, Plaintiff believes, and thereon alleges, that Defendants' unlawfully

12   discriminatory conduct, as discussed above, will continue unless enjoined by this court. On these

13   grounds, and as Plaintiff and the putative class have been subjected to Amazon's aforementioned

14   violations of the FEHA and Labor Code, Plaintiff also seeks redress in the form of injunctive relief.

15        117.   The acts and practices alleged above have unlawfully deprived Plaintiff and the putative

16   class of the rights due to them under the law while enabling Amazon to gain an unfair competitive

17   advantage over law-abiding employers and competitors.

18        118.   As a direct and proximate result of the aforementioned acts and practices, Plaintiff and

19   the putative class have suffered a loss of money and property in the form of wages and benefits that she

20   would have continued to receive as an employee of Defendants.

21        119.   Plaintiff seeks an order of this court awarding restitution, injunctive relief, and all other

22   legal and equitable relief allowed under Bus. & Prof. Code section 17200 *et seq.*, plus interest, attorneys'

23   fees and costs pursuant to, *inter alia*, Code of Civil Procedure section 1021.5.

24                                **PRAYER FOR RELIEF**

25        WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief

26   and judgment as follows:

27        1.     An order that the action be certified as a class action;

28        2.     An order that Plaintiff be appointed class representative;

1    3.    An order that counsel for Plaintiff be appointed class counsel;

2    4.    For all compensatory damages in the form of consequential, and incidental damages,

3    including but not limited to back pay, front pay, wages, loss of earnings and employee benefits and

4    damages for emotional distress, according to proof;

5    5.    For general and special damages, and interest thereon, according to proof;

6    6.    For restitution for unfair competition pursuant to Business & Professions Code § 17200

7    *et seq.*, including disgorgement of profits resulting from Amazon's unlawful business acts and practices,

8    according to proof;

9    7.    A declaratory judgment that the practices complained of therein are unlawful and violate,

10   among other laws, Cal. Gov. Code § 12940 *et seq.*; and Cal. Bus. & Prof. Code § 17200 *et seq.*;

11   8.    For an order enjoining Defendants and their agents, servants, and employees, and all

12   persons acting under, in concert with, or for them, from acting in derogation of any rights or duties

13   adumbrated in this complaint;

14   9.    For pre-judgment and post-judgment interest, according to proof;

15   10.   For attorneys' fees, according to proof;

16   11.   For costs of suit incurred herein; and

17   12.   For such other relief the court may deem just and proper.

18                        **DEMAND FOR JURY TRIAL**

19   Plaintiff hereby demands trial of her claims by jury to the extent authorized by law.

20

21   DATED:  August 29, 2022                 SETAREH LAW GROUP

22

23

24                                           SHAUN SETAREH
                                             JOSE MARIA D. PATINO, JR.
25                                           MAXIM GORBUNOV
                                             TYSON GIBB
26                                           Attorneys for Plaintiff
                                             AMY FUJISHIGE
27

28

- 29 -
CLASS ACTION COMPLAINT

# EXHIBIT A



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                    GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                    KEVIN KISH, DIRECTOR
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | Email: contact.center@dfeh.ca.gov

August 26, 2022

Jose Patino
9665 Wilshire Blvd., Suite 430
Beverly Hills, CA 90212

RE:   **Notice to Complainant's Attorney**
      DFEH Matter Number: 202208-18045025
      Right to Sue: Fujishige / AMAZON.COM SERVICES LLC

Dear Jose Patino:

Attached is a copy of your complaint of discrimination filed with the Department of Fair
Employment and Housing (DFEH) pursuant to the California Fair Employment and
Housing Act, Government Code section 12900 et seq. Also attached is a copy of your
Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, DFEH will not serve these
documents on the employer.** You must serve the complaint separately, to all named
respondents. Please refer to the attached Notice of Case Closure and Right to Sue for
information regarding filing a private lawsuit in the State of California. A courtesy "Notice
of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the DFEH does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,


Department of Fair Employment and Housing

Form DFEH-ENF 80 RS (Revised 02/22)



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                           KEVIN KISH, DIRECTOR
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | Email: contact.center@dfeh.ca.gov

August 26, 2022

RE:   **Notice of Filing of Discrimination Complaint**
      DFEH Matter Number: 202208-18045025
      Right to Sue: Fujishige / AMAZON.COM SERVICES LLC

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the
Department of Fair Employment and Housing (DFEH) in accordance with Government
Code section 12960. This constitutes service of the complaint pursuant to Government
Code section 12962. The complainant has requested an authorization to file a lawsuit. A
copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for DFEH's Small Employer Family Leave Mediation
Pilot Program. Under this program, established under Government Code
section 12945.21, a small employer with 5 -19 employees, charged with violation
of the California Family Rights Act, Government Code section 12945.2, has the
right to participate in DFEH's free mediation program. Under this program both
the employee requesting an immediate right to sue and the employer charged
with the violation may request that all parties participate in DFEH's free
mediation program. The employee is required to contact the Department's
Dispute Resolution Division prior to filing a civil action and must also indicate
whether they are requesting mediation.  The employee is prohibited from filing a
civil action unless the Department does not initiate mediation within the time
period specified in section 12945.21, subdivision (b) (4), or until the mediation is
complete or is unsuccessful. The employee's statute of limitations to file a civil
action, including for all related claims not arising under section 12945.2, is tolled
from the date the employee contacts the Department regarding the intent to
pursue legal action until the mediation is complete or is unsuccessful. You may
contact DFEH's Small Employer Family Leave Mediation Pilot Program by
emailing DRDOnlinerequests@dfeh.ca.gov and include the DFEH matter
number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact
information.

No response to DFEH is requested or required.

Sincerely,



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | Email: contact.center@dfeh.ca.gov

Department of Fair Employment and Housing



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                          GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                          KEVIN KISH, DIRECTOR
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | Email: contact.center@dfeh.ca.gov

August 26, 2022

Amy Fujishige

RE:   **Notice of Case Closure and Right to Sue**
      DFEH Matter Number: 202208-18045025
      Right to Sue: Fujishige / AMAZON.COM SERVICES LLC

Dear Amy Fujishige:

This letter informs you that the above-referenced complaint filed with the Department of
Fair Employment and Housing (DFEH) has been closed effective August 26, 2022
because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

This matter may qualify for DFEH's Small Employer Family Leave Mediation
Pilot Program. Under this program, established under Government Code section
12945.21, a small employer with 5 -19 employees, charged with violation of the
California Family Rights Act, Government Code section 12945.2, has the right to
participate in DFEH's free mediation program. Under this program both the
employee requesting an immediate right to sue and the employer charged with
the violation may request that all parties participate in DFEH's free mediation
program. The employee is required to contact the Department's Dispute
Resolution Division prior to filing a civil action and must also indicate whether
they are requesting mediation. The employee is prohibited from filing a civil
action unless the Department does not initiate mediation within the time period
specified in section 12945.21, subdivision (b) (4), or until the mediation is
complete or is unsuccessful. The employee's statute of limitations to file a civil
action, including for all related claims not arising under section 12945.2, is tolled
from the date the employee contacts the Department regarding the intent to
pursue legal action until the mediation is complete or is unsuccessful. Contact
DFEH's Small Employer Family Leave Mediation Pilot Program by emailing
DRDOnlinerequests@dfeh.ca.gov and include the DFEH matter number
indicated on the Right to Sue notice.

Form DFEH-ENF 80 RS (Revised 02/22)

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,


Department of Fair Employment and Housing

Form DFEH-ENF 80 RS (Revised 02/22)

# COMPLAINT OF EMPLOYMENT DISCRIMINATION
## BEFORE THE STATE OF CALIFORNIA
## DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

**In the Matter of the Complaint of**

Amy Fujishige                                          DFEH No. 202208-18045025

                          Complainant,

vs.

AMAZON.COM SERVICES LLC
410 TERRY AVENUE NORTH
SEATTLE, WA 98109

                          Respondents

---

**1.** Respondent **AMAZON.COM SERVICES LLC** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2.** Complainant **Amy Fujishige**, resides in the City of , State of .

**3.** Complainant alleges that on or about **July 8, 2021**, respondent took the following adverse actions:

**Complainant was discriminated against** because of complainant's sex/gender, gender identity or expression, genetic information or characteristic, association with a member of a protected class and as a result of the discrimination was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, suspended, demoted, denied any employment benefit or privilege, denied work opportunities or assignments, denied or forced to transfer.

**Additional Complaint Details:** 1. Complainant Amy Fujishige is a woman, five feet in height, who worked for Amazon at its Fulfillment Center in California from about September 16, 2020, through about July 8, 2021 as a picker and counter
2.     AMAZON.COM SERVICES, LLC, ("Amazon") is the world's largest retailer and sixth-largest company, shipping on average an astronomical 1.6 million packages per day. Throughout the United States, including California, Amazon operates large warehouses, or "fulfillment centers," which have on the order of a million square feet of floor space, where

-1-
*Complaint – DFEH No. 202208-18045025*

Date Filed: August 26, 2022

Form DFEH-ENF 80 RS (Revised 02/22)

millions of consumer products are stored and inventoried and from which deliveries are made to its customers, including its famous "Amazon Prime" two-day delivery. These fulfillment centers operate by hiring thousands of hourly employees to receive, stow, count, pick, pack, and load onto trucks these products quickly to keep up with Amazon's delivery schedule.

3.      Amazon's primary concern in these fulfillment centers is "productivity," or moving as many packages of inventory as possible. Amazon measures and enforces its productivity by imposing a quota system upon its warehouse employees. However, in striving to maximize productivity, Amazon has implemented and continues to implement employment policies and procedures at its fulfillment centers that, in operation, discriminate against female employees by inflicting significant adverse impacts upon them, including Plaintiff, when compared to Amazon's male employees assigned to the same tasks and positions.

4.      Failing to consider the demographic reality that, on average, in the United States, including California, adult men are significantly taller than adult women, Amazon unnecessarily places female employees at its fulfillment centers at a significant disadvantage compared to male employees, in effect, punishing them for their generally shorter stature.

5.      The design and setup of Amazon's fulfillment centers, the procedures associated with Amazon's "pods," and the safety policies and Amazon's Quality and Productivity Performance Policy ("Productivity Policy") applicable thereto are seemingly tailored to the height and strength of the male physique, rather than the female physique. In the United States, the adult population of men is overwhelmingly taller than the adult female population, and at each percentile of the height distribution for each of the sexes, men are taller than women. These two simple facts work together to subject women at Amazon's fulfillment centers where pods are used in the United States, including California, to disproportionately more adverse employment actions and terminations than men on the basis of their weekly Productivity Scores.

6.      Since it acquired Kiva Systems, a robotics company, in 2012, Amazon's fulfillment centers have utilized pods, (i.e., movable stacks of shelves with "bins" of various sizes brought to and from workstations by automated robots) to store items that are "picked" for shipping when orders come in. These pods are eight feet (96 inches) in height. Amazon's proprietary AI algorithm tracks the locations of all items on all pods and assigns each warehouse employee tasks involving these pods. Warehouse employees complete these tasks by scanning items to be taken from, counted for, or placed in, the pods and each must stay within a workstation, which is a fixed area with a computer touchscreen interface, a rack of totes (i.e., large bins from which items will be taken to stow onto pods or into which items will be placed for shipping and delivery), and a large, heavy metal stepladder fixed on a sliding track for use when reaching for bins located high up the pods. If using the stepladder does not suffice for the employee to safely reach an item, then entry-level warehouse employees must call over a Process Assistant—a roving, veteran employee of higher rank who assists employees when needed—to reach the bin for them.

7.      Productivity Policy: Performance Metrics and Expectations. Amazon sets targets for productivity each day and ranks warehouse employees by their "Productivity Score" on a weekly basis, which takes into consideration, among other things, the number of units (i.e., warehoused items to be stowed away in pods, counted for inventory, or picked for shipping to customers) scanned per hour ("Units Per Hour" or "UPH") and the amount of time

-2-

Date Filed: August 26, 2022

Form DFEH-ENF 80 RS (Revised 02/22)

1   employees spend "off task" (i.e., not scanning units) ("Time Off Task" or "TOT").  On a daily
2   basis, Amazon expects employees to maintain a grueling pace of approximately 300 UPH!
    However, Amazon does not disclose any of the other factors considered in Productivity
3   Scores and only reveals UPH and TOT metrics to an employee when issuing a written
    warning for productivity issues.
4   8.     Employees who need to use the stepladders or to wait for the assistance of Process
    Assistants more often will take more time to complete a task, on average, than those who do
5   not, lowering the UPH and increasing their TOT.  This confers an advantage to taller people
    over shorter people in achieving higher Productivity Scores.
6   9.     Productivity Policy: Punishment of Those Ranked in the Bottom 5%. Amazon then
    uses stack ranking to effectively decimate the workforce by punishing the most
7   disadvantaged employees.  Discipline is meted out on the basis of relative performance,
    rather than by an absolute metric.  Specifically, the bottom 5% in the Productivity Score
8   rankings each week are subject to discipline in the form of written warnings, regardless of
    how well those employees may have performed objectively.  Then, if an employee receives
9   6 written warnings of any type, or 3 productivity warnings, within a rolling period of 12
    months, that employee is subject to termination.
10  10.    Essentially, these policies and procedures operate to unfairly punish the bottom 5%
    of Amazon's warehouse employees ranked by Productivity Scores, eventually culling them
11  from the employment roster.   Those subject to this cruel policy of decimation are
    disproportionately women due to their overall smaller stature compared to men in the
12  general population.  This includes Plaintiff, who stands five feet tall and was disciplined and
    eventually terminated for her low Productivity Scores.  The policies and practices described
13  above and herein have had a significant adverse impact against Plaintiff and the similarly
    situated female employees of Amazon.  In order to keep pace with the mostly taller male
14  employees, Plaintiff and other female employees have had to continually forgo Amazon's
    safety policies and procedures in order to reach items located high up on the pods in order
15  to sufficiently maintain their Productivity Scores by keeping their UPH up and their TOT
    down.  But, this is a double-edged sword that dramatically increases their chances of injury.
16  Amazon's Productivity Policy thus puts its female employees in an impossible position,
    forcing them to choose between protecting their health or protecting their livelihood.
17  11.    Amazon has had the opportunity, the means, and the expertise to address the
18  disparate impact these design, policy, and procedural choices in its fulfillment centers have
    against women.  In fact, Ms. Fujishige raised these issues to her managers whenever she
19  was disciplined and written up for being the bottom 5% of Productivity Scores.  In its written
    warnings to Plaintiff, Amazon even explicitly stated that it would work with her to help with
20  any productivity issues she has.  Though she advised her managers at length on several
    occasions regarding the disadvantages of having to use the stepladder or call over a
21  Process Assistant in order to reach the higher shelves, and though she proposed possible
    solutions to them, such as having her pull only from the lower bins within her reach rather
22  than getting assigned items in higher bins, Amazon never did anything to alleviate her and
    other female employees' height disadvantage, and to date, Amazon's female employees are
23  still subject to the same pattern and practices at its fulfillment centers.
24  12.    These policies, procedures, and practices have been in place throughout the time
    period that pods have been in use at Amazon's fulfillment centers.  Since, to date, Amazon
25

26                                           -3-
27
    Date Filed: August 26, 2022
28

Form DFEH-ENF 80 RS (Revised 02/22)

1 | has refused to modify them to address their discriminatory effects, their disparate adverse impacts upon Amazon's female employees are continuing and ongoing.

2 | 13.      Based on the allegations herein, Plaintiff seeks general, special, compensatory,

3 | actual, consequential, and incidental damages and interest thereon, restitution, injunctive relief, declaratory relief, attorneys' fees, costs of suit, and other remedies discussed below on behalf of herself and all others similarly situated under FEHA and Title VII of the Civil

4 | Rights Act, as amended by the Civil Rights Act of 1991.

5 | 14. At all times mentioned herein, Amazon was and is an employer within the meaning of the FEHA because it did and does employ five or more persons. At all times mentioned

6 | herein, Amazon was and is an employer within the meaning of the Title VII of the Civil Rights Act, as amended by the Civil Rights Act of 1991.because it did and does employ fifteen or

7 | more persons.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

-4-

*Complaint – DFEH No. 202208-18045025*

27

Date Filed: August 26, 2022

28

Form DFEH-ENF 80 RS (Revised 02/22)

VERIFICATION

I, **Shaun Setareh**, am the **Attorney** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof.  The matters alleged are based on information and belief, which I believe to be true.

On August 26, 2022, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Beverly Hills, California**

-5-
*Complaint – DFEH No. 202208-18045025*

Date Filed: August 26, 2022

Form DFEH-ENF 80 RS (Revised 02/22)

22CV403296
Santa Clara – Civil
R. Fleming

**POS-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |

Shaun Setareh, 204514
Law Office of Shaun Setareh
9665 Wilshire Blvd., Suite 430
Beverly Hills, CA 90212
  TELEPHONE NO.: (310)888-7771
ATTORNEY FOR *(Name):* Plaintiff

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 9/26/2022 12:00 AM
Reviewed By: R. Fleming
Case #22CV403296
Envelope: 10044869**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, Santa Clara County
191 N. First Street
San Jose, CA 95113-1090

PLAINTIFF/PETITIONER: AMY FUJISHIGE, et al

DEFENDANT/RESPONDENT: AMAZON.COM SERVICES, LLC, et al

CASE NUMBER:
22CV403296

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: AMAZON |
|---|---|

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.
2. I served copies of:

Civil Case Cover Sheet Class Action, Class Action Complaint, Summons

3. a. Party served:  AMAZON.COM SERVICES, LLC, a Delaware limited liability company

   b. Person Served: CSC - Trudy Desbiens - Person Authorized to Accept Service of Process

4. Address where the party was served: 2710 Gateway Oaks Drive, Suite 150N
   Sacramento, CA 95833
5. I served the party
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 09/21/2022          (2) at (time): 1:28PM
6. The "Notice to the Person Served" (on the summons) was completed as follows:

   d. on behalf of:

   AMAZON.COM SERVICES, LLC, a Delaware limited liability company
   under: Other: Limited Liability Company
7. **Person who served papers**
   a. Name:        Tyler Anthony DiMaria
   b. Address:     One Legal - P-000618-Sonoma
                   1400 North McDowell Blvd, Ste 300
                   Petaluma, CA 94954

   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 32.00
   e I am:
       (3)  registered California process server.
           (i)  Employee or independent contractor.
           (ii)  Registration No.: 2006-06
           (iii)  County: Sacramento
8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date:  09/21/2022

Tyler Anthony DiMaria
(NAME OF PERSON WHO SERVED PAPERS)

(SIGNATURE)

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

OL# 18826188